# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| ROGER SHANE PEBSWORTH, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 16-CV-644-TCK-FHM ) |
| SPIRIT AEROSYSTEMS, INC.; and JORDAN C. KENTZLER, | ) ) ) |
| Defendants. | ) ) |

## OPINION AND ORDER

Before the Court are Defendant Spirit Aerosystems, Inc.'s ("Spirit") Motion to Enforce Settlement Agreement ("Motion to Enforce") (Doc. 21) and Plaintiff's Motion to Request Status Conference to Set New Trial Date and Decide Defendants' Pending Motion to Enforce Settlement Agreement In Order to Expedite Trial and/or Settlement ("Motion for Status Conference") (Doc. 34).

**I.    Standard Governing Motion to Enforce Settlement Agreement**

"A trial court has the power to summarily enforce a settlement agreement entered into by the litigants while the litigation is pending before it." *Farmer v. Banco Popular of N. Am.*, 557 F. App'x 762, 767 (10th Cir. 2014); *see also Fid. & Guar. Ins. Co. v. Star Equip. Corp.*, 541 F.3d 1, 5 (1st Cir. 2008) (explaining that when "the settlement collapses before the original suit is dismissed, the party seeking to enforce the agreement may file a motion with the trial court"). A "trial court may summarily enforce the agreement, provided that there is no genuinely disputed question of material fact regarding the existence or terms of that agreement." *Fid. & Guar. Ins. Co. v. Star Equip. Corp.*, 541 F.3d at 5. "When a genuinely disputed question of material fact does exist, the court should hold a hearing and resolve the contested factual issues." *Id.* Because Spirit urges the Court to rule

on the Motion to Enforce as a matter of law, the Court treats the Motion to Enforce as essentially a motion for summary adjudication on the issue of whether the parties reached an agreement to settle all claims in this lawsuit at any point during the negotiations.

## II. Factual Background

The following facts are undisputed in the evidentiary record. Where facts are disputed or would be potentially disputed at an evidentiary hearing on this issue, the Court so indicates. Plaintiff was terminated from employment at Spirit. During the course of his termination, Plaintiff alleges he was frisked and searched by a Spirit security guard. In his Complaint, which was filed in Creek County District Court, Plaintiff asserts the following claims against Spirit: (1) interference and retaliation under the Family and Medical Leave Act ("FMLA"); and (2) tort claims for assault, battery, false imprisonment, and intentional infliction of emotional distress. Plaintiff also asserts a claim for malicious interference with contract against Defendant Jordan Kentzler, Spirit's Human Resources Supervisor. However, Plaintiff never served Kentzler, and he has not been involved with any of the settlement discussions addressed below. On October 18, 2016, Spirit removed the action.

In November 2016, the parties engaged in settlement negotiations. On or around December 8, 2016, then-counsel for Plaintiff Brendan McHugh ("McHugh") agreed to settle all claims asserted in the lawsuit for an agreed sum. McHugh filed a notice of settlement with the Court. Upon receipt of an email from Defendant's counsel, Kimberly Lambert Love ("Love"), setting forth general terms of the settlement, McHugh responded by saying the terms were correct and stating his belief that the settlement did not extend to a pending union grievance filed by Plaintiff in conjunction with his termination. Love contacted McHugh, informed him that the offer of settlement included release of the union grievance, and informed him that this was "a deal breaker." McHugh responded by

saying he would confirm with Plaintiff, that he did not think he would be happy, but that Plaintiff "should be ok."

On December 12, 2016, Love asked McHugh if he had been able to confirm the settlement terms with Plaintiff. In an affidavit attached to Spirit's reply brief, McHugh stated the following regarding his communications with Plaintiff on December 12 or 13, 2016:

> . . . I contacted [Plaintiff] by telephone in direct response to Ms. Love's insistence that the union grievance be resolved by the settlement of the civil case. I urged Mr. Pebsworth to accept the settlement and resolve the union grievance as a part of the settlement. I took notes during this conversation. My notes read, "Roger, union guy sucks are not doing anything, suing them too, settlement is fine." I was aware that Roger was unhappy with his union representation and process, and he did not believe he would have a successful resolution with the union grievance. Based on this conversation and my advice, [Plaintiff] gave me authority to enter into a global settlement with the Defendants of all claims except his pending Workers' Compensation injury claim. [See Exh. 1-E, which is a copy of my notes prepared while speaking with [Plaintiff] by telephone on December 12 or 13, 2016.]

(Doc. 31-1 at ¶ 7.) McHugh did not contact Love to accept the settlement offer immediately following this phone conversation on December 12 or 13, 2016.

Based on text and email exchanges in the record, the following events occurred on December 14, 2016. At 7:09 am, Plaintiff texted McHugh and stated "We gonna do this deal or not?" At 8:16 am, McHugh said "Yes." At 8:18 am, Plaintiff stated "Ok. I keep having second thoughts they are gonna mess up my other cases." At 8:58 am, McHugh emailed Love and said "Yes. It is confirmed." At 8:59 am, McHugh texted Plaintiff and said "We can not change mind." (*See* Doc. 31-1 at Ex. 1-F & Doc. 21-1 at Ex. 1-C.) According to McHugh, he did not see the "second thoughts" text until after he confirmed the settlement at 8:58am. Obviously, this is McHugh's version of events. A reasonable person could conclude from the above timeline of events that McHugh saw the 8:18am text, decided to accept the offer anyway, and then told Plaintiff it was too late.

3

On December 15, 2016, a written settlement agreement was sent by Love's firm to McHugh for Plaintiff's signature. On Tuesday, December 20, 2016, McHugh sent Plaintiff the settlement agreement. Plaintiff sent McHugh a text stating:

> They added a bunch of shit in there that would be giving away my rights for chump change. Tell them no thanks. The ONLY thing I'm signing off on is the unlawful frisk. I know my other attorney is without a doubt is filing retaliation discharge and the eeoc is gonna find discrimination as well. If you want out of the case let me know . . . . They have screwed me for a year get is a court date and my grievance is about to come up next month[.]

(Doc. 28 at 7.) McHugh responded by telling Plaintiff he could not get out of the settlement agreement he had already accepted. Plaintiff continued to state in his texts that he had not agreed to release his union grievance or federal claims. In his affidavit, Plaintiff denies that he ever agreed to a global settlement or to release his union grievance. (Doc. 28 at 11.) On January 5, 2017, Spirit filed the Motion to Enforce.

## III. Analysis

When the issue of contract formation is at issue, courts "look to state contract law to resolve the matter." *Farmer,* 557 F. App'x at 767. Under Oklahoma law, "a settlement agreement is an oral or written contract between the parties" that is subject to the rules of offer, acceptance, and mutual assent. *In re De-Annexation of Certain Real Prop.*, 204 P.3d 87, 90 (Okla. 2009). In the specific context of settlement agreements, it is well-settled Oklahoma law that "an attorney has no power or authority to compromise or settle a case without appropriate authority from the client." *Badillo v. Mid Century Ins. Co.*, 121 P.3d 1080, 1096 (Okla. 2005). Where a "client denies that the attorney was given authority to compromise such claim, the burden is upon the attorney to show by a preponderance of the evidence that he was given such authority" or that the client "approved it, or received the benefits" after the agreement was made. *Scott v. Moore*, 152 P. 823, 824 (Okla. 1915).

4

The Court finds, as a matter of law, that the parties did not have an agreement on December 9, 2016 because (1) Love and McHugh lacked mutual assent regarding whether the union grievance was released, and (2) McHugh lacked Plaintiff's consent to enter into a settlement that released the union grievance.

With respect to December 14, 2016, the Court finds that disputed questions of fact exist as to whether McHugh had authority to consent to an agreement that released the federal claim and union grievance. McHugh contends that, after he raised the union grievance issue and Love made clear that it was a "deal breaker," McHugh received consent from his client and accepted the offer. However, Plaintiff denies giving McHugh authority to release his union grievance or any of his federal claims. The timeline of texts exchanged between Plaintiff and McHugh does not assure the Court that Plaintiff in fact understood and consented to this new term by phone on December 12 or 13, 2016. Plaintiff began the texts with a question of whether they were going to complete the deal or not, and Plaintiff continued expressing his concerns via text prior to McHugh's acceptance via email at 8:58am. Therefore, Defendant is not entitled to summary adjudication on the Motion to Enforce.

## IV. Conclusion

The Motion to Enforce (Doc. 21) is DENIED in part and HELD IN ABEYANCE in part. It is DENIED as to whether the parties reached an agreement on December 8 or 9, 2016, and Plaintiff is entitled to *sua sponte* summary adjudication on this issue. It is held in abeyance pending an evidentiary hearing as to whether an agreement was reached on December 14, 2016.

Plaintiff's Motion for Status Conference (Doc. 34) is DENIED. Therein, Plaintiff informed the Court that Plaintiff and Spirit ultimately went forward with the union grievance but that a decision will not be released until this Court rules on the Motion to Enforce. Because the parties

have proceeded with the union grievance, Spirit may wish to withdraw its Motion to Enforce, forego an evidentiary hearing, and set the case for trial.

Spirit is ordered to inform the Court, no later than one week from the date of this Order, whether it wishes to withdraw the Motion to Enforce and set the case for trial or proceed with an evidentiary hearing.

**IT IS SO ORDERED this 29th day of June, 2017.**

**TERENCE KERN**
**United States District Judge**